IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SILVIA URIBE, ALBERTO CAMERANA, EFREN GURROLA, and ALBERTO MELENDREZ-MORENA,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:04 CR 769 TC |

As part of an investigation into methamphetamine trafficking in Salt Lake City, Utah, the United States obtained wiretaps on several phone lines used by Defendant Efren Gurrola. This matter is now before the court on Mr. Gurrola's motion to suppress the evidence obtained by the United States as a result of those wiretaps. Mr. Gurrola contends that the intercepted conversations must be suppressed because the United States failed to establish that the wiretaps were necessary to the investigation. Mr. Gurrola also contends that the United States failed to engage in proper minimization of the intercepted conversations. The court held an evidentiary hearing on February 10, 2006. Having reviewed the materials submitted by the parties and having considered the evidence from the hearing, the court concludes that the United States made an adequate showing of necessity and properly minimized its surveillance. Therefore, for the reasons more fully discussed below, Mr. Gurrola's motion to suppress is DENIED.

Background

The facts relevant to the current motion begin with an investigation of two of Mr. Gurrola's co-defendants: Silvia Uribe and Alberto Camerana. In March of 2004, the Drug Enforcement Administration began an investigation of methamphetamine trafficking in Salt Lake City, Utah. (See Ex. 1 Aff. at 6.)[1] Special Agent David L. Crosby began the investigation after he was informed by a confidential source that Uribe was involved in drug trafficking. (See id.) Over the next several months, Special Agent Crosby conducted multiple controlled buys with both Ms. Uribe and her husband, Mr. Camerana. (See id. at 13-17, 31-34.) In furtherance of the investigation, undercover officers also placed a global positioning satellite tracker on Ms. Uribe's car, enabling agents to track her movements, and obtained call detail records on phone numbers used by Ms. Uribe and Mr. Camerana. (See id. at 36, 39.)

On August 17, 2004, the DEA submitted an application for a wiretap on two phone lines subscribed to by Mr. Camerana. (See Ex. 1 App.) In support of that application, Special Agent Crosby provided an affidavit detailing the investigation up to that point and explained that a wiretap was necessary to discover who was acting as Ms. Uribe and Mr. Camerana's drug supplier. (See Ex. 1 Aff. at 8-39.) The wiretap application was granted. (See Ex. 1 Order.)

Through the course of the next several weeks, investigators, with the aid of the wiretaps, were able to link Ms. Uribe and Mr. Camerana to Mr. Gurrola. (See Ex. 2 Aff. at 6.) Specifically, investigators monitored several calls made between the wiretapped lines and a

---

[1] The court received seven exhibits into evidence at the evidentiary hearing. Each individual exhibit contains a wiretap application, an affidavit supporting that application, and an order granting the application. The initial application was submitted on August 17, 2004. (See Ex. 1 App.) The first application naming Mr. Gurrola as a target was submitted on September, 18, 2004. (See Ex. 3 App.) Two additional applications were submitted on September 22, 2004. (See Ex. 4 App; Ex. 5 App.). Another application was submitted on October 26, 2004. (See Ex. 6 App.) The final application was submitted on October 29, 2004. (See Ex. 7 App.)

phone number used by an unidentified male who investigators believed to be Ms. Uribe and Mr. Camerana's supplier. (<u>See</u> <u>id.</u>) Physical surveillance was used to establish that the phone number linked to Ms. Uribe and Mr. Camerana's suspected supplier was used by Mr. Gurrola. (<u>Id.</u>)

On September 13, 2004, investigators once again submitted an application for a wiretap, this time expressly designating Mr. Gurrola as a target. (<u>See</u> Ex. 2 App.) The reviewing court approved the application. (<u>See</u> <u>id.</u> Order.) Five additional wiretap applications targeting Mr. Gurrola were later submitted and granted.

<u>Analysis</u>

Mr. Gurrola alleges that the United States failed to adequately establish that obtaining wiretaps on phone lines used by Mr. Gurrola was necessary and further alleges that the United States failed to engage in proper minimization when undertaking the surveillance. A wiretap should not be approved unless a judge concludes that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This requirement is commonly referred to as the "necessity requirement." <u>United States v. Garcia</u>, 232 F.3d 1309, 1312 (10th Cir. 2000). Additionally, the United States Code requires every order authorizing a wiretap to "contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). This requirement is commonly referred to as the "minimization requirement." <u>Garcia</u>, 232 F.3d at 1312. Each of Mr. Gurrola's claims will be addressed in turn.

**I. Necessity**

The United States Code requires each application for a wiretap to contain "a full and complete statement as to whether or not other investigative procedures have been tired and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Before approving a wiretap application, the reviewing judge must agree that, considering the investigative techniques attempted and the probability of danger or success associated with untried methods, the wiretap is, in fact, necessary. See id. § 2518(3)(c). If the record establishes that the United States failed to adequately meet the "necessity requirement," evidence obtained as a result of the wiretap should be suppressed. See United States v. Castillo-Garcia, 117 F.3d 1179, 1185 (10th Cir. 1997), overruled on other grounds by United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002).

"The necessity requirement . . . is not an exhaustion requirement." Id. at 1187 (internal quotation omitted). Law enforcement officials "are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping." United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995). The necessity requirement is simply a mechanism that "ensure[s] that the relatively intrusive device of wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" Id. at 429 (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)).

The Tenth Circuit has identified four categories of traditional investigative techniques that an applicant for a wiretap should address when making a showing of necessity: (1) standard visual and aural surveillance; (2) questioning of witnesses, including the use of grand juries; (3) search warrants; and (4) infiltration by undercover agents or informants. See Castillo-Garcia, 117 F.3d at 1187. Additionally, pen registers and trap and trace devices should also be

considered "because they possess a logical relationship and close affinity to wiretaps and yet are less intrusive." Id. at 1187-88. "[I]t is unnecessary for the government to address each category formally if 'the government's stated explanation for its use, or failure to use, normal investigative techniques clearly encompasses each of these categories and any other' applicable and 'normal investigative technique.'" United States v. Wright, 156 F. Supp. 2d. 1218, 1225 (D. Kan. 2001) (quoting Castillo-Garcia, 117 F.3d at 1188).

      Mr. Gurrola contends that the wiretap applications that identify him as a target fail to meet the standard outlined above. The main thrust of Mr. Gurrola's argument is that the six wiretap applications that specifically designate him as a target drew too heavily upon the necessity showing made in the initial August 17, 2004 application, in which Mr. Gurrola was not a named target. In essence, Mr. Gurrola argues that facts supporting a finding of necessity in relation to his co-defendants should not have been weighed by the court when deciding whether to authorize the wiretaps that targeted him.

      The six applications at issue here contain almost identical statements supporting the necessity of a wiretap. Although the substance of the applications, in all material aspects, remains the same, later applications reveal a heightened sense of urgency and concern that the targets suspect they may be under investigation. Additionally, later applications supply updated information about the status of the investigation as well as information gleaned from previously approved call monitoring. The court concludes that all six applications adequately meet the necessity requirement.

The September 13, 2004 application was supported by an affidavit signed by Special Agent Eric Breyer.[2] (See Ex. 2 Aff. at 29.) The affidavit indicates that physical surveillance of the targets (Ms. Uribe, Mr. Camerana, and Mr. Gurrola) had been conducted but Special Agent Breyer concludes that continuing physical surveillance would not likely lead to the acquisition of any additional useful information. (See id. at 19-20.) Mr. Gurrola argues that the physical surveillance described in the affidavit referred almost exclusively to agents' surveillance of Ms. Uribe and Mr. Camerana and that the affidavit is deficient because it does not adequately explain why physical surveillance of Mr. Gurrola would not be successful.

While the bulk of the physical surveillance described in the affidavit was focused on Ms. Uribe and Mr. Camerana, the affidavit does make reference to sightings of Mr. Gurrola's car at the residence of Ms. Uribe and Mr. Camerana and it was visual surveillance of Mr. Gurrola that enabled agents to confirm that he was the unidentified male Ms. Uribe was communicating with regarding the acquisition of methamphetamine. (See id. at 6.) The affidavit also contains information about counter-surveillance techniques implemented by Ms. Uribe and Mr. Camerana, such as changing buy locations at the last minute and traveling on low-traffic streets. (See id. at 20.) Although the affidavit does not specifically attribute any counter-surveillance activities to Mr. Gurrola, the affidavit provides substantial evidence that the three targets were operating as a group, sharing information, and were jointly concerned with possible surveillance of their activities. (See,e.g., id. at 9.) Further, the affidavit highlights that conversations between the three individuals indicated that any transactions among themselves would be conducted

---

[2]Special Agent Breyer also served as the signatory on the affidavit supporting the September 18, 2004 application. Special Agent Crosby was the signatory on all other affidavits. Although Special Agent Breyer was not present at the evidentiary hearing held in this matter, Special Agent Crosby testified that he helped prepare the affidavits signed by Special Agent Breyer and approved the affidavits before they were submitted to the court.

within one of their residences, making physical surveillance of actual transactions impracticable. (<u>See</u> <u>id.</u> at 19-20.)

The affidavit also outlines agents' attempts to flush out Ms. Uribe and Mr. Camerana's supplier by slowly increasing the amount of methamphetamine purchased during the controlled buys. (<u>See</u> <u>id.</u> at 21.) But before obtaining the wiretap on the phone lines used by Ms. Uribe and Mr. Camerana, agents were unable to identify Ms. Uribe and Mr. Camerana's supplier. (<u>See</u> <u>id.</u>) Agents' attempts to involve Mr. Gurrola in controlled transactions had been unsuccessful and the transactions occurring between Ms. Uribe, Mr. Camerana, and Mr. Gurrola were conducted in private residences. (<u>See</u> <u>id.</u> at 19-21.) Therefore, it is reasonable to conclude that further attempts at physical surveillance would not have provided agents with additional information and would have increased the risk that the targets would detect the surveillance activities and discover the investigation.

After discussing physical surveillance, the affidavit then addresses the feasability of interrogating witnesses and calling a grand jury. (<u>See</u> <u>id.</u> at 22.) According to Special Agent Breyer, witness interrogation or use of a grand jury did "not appear to be a promising method of investigation." (<u>Id.</u>) At the time this application was submitted, the only potential witnesses agents had positively identified were either members of the suspected conspiracy or people who would likely expose the investigation. (<u>See</u> <u>id.</u>) Further, Special Agent Crosby commented that the details of the conspiracy were still unknown and that granting a participant or participants immunity in exchange for testimony would be ill-advised until the full extent of the targets' involvement in the suspect conspiracy was discovered. (<u>See</u> <u>id.</u>) Considering the status of the investigation at the time this application was submitted, it is reasonable to conclude that witness

interrogation or use of a grand jury would have subverted the entire investigation and therefore law enforcement officials were not obligated to pursue that method of investigation.

Additionally, the affidavit makes clear that infiltration of the conspiracy by informants was not possible.  (See id. at 23.)  The investigation of Ms. Uribe, Mr. Camerana, and Mr. Gurrola was initially made possible because of information provided by a confidential informant.  (See Ex. 1 Aff. at  6.)  As the investigation continued to unfold, however, Mr. Gurrola and Ms. Uribe talked openly about their suspicions of the confidential informant in question, such that any attempt of further infiltration by that informant would almost certainly be impossible.  (See Ex. 2 Aff. at 23.)  Also, as mentioned above, uncover agents' attempts to draw Mr. Gurrola into controlled transactions had failed and there was no indication that further attempts would be successful.  (See id. at 19-21.)  Consequently, it is reasonable to conclude that further infiltration of the conspiracy was not a viable investigatory route to pursue.

Addressing the potential usefulness of search warrants, Special Agent Breyer stated in the affidavit that use of such an investigatory technique would be ill-advised.  (See id. at 23.)  According to Special Agent Breyer, the use of search warrants would have almost certainly exposed the investigation and caused its termination before a more detailed understanding of the operation could be obtained.  (See id.)  Additionally, at the time the application was submitted, agents were still attempting to discern exactly where the participants in the alleged conspiracy were storing drugs, making search warrants an unattractive alternative due to the limited probability of obtaining helpful information.  (See id. at 23-24.)  Against such a backdrop, it was not unreasonable to reject the use of this investigative technique.

Special Agent Breyer acknowledges in the September 13, 2004 affidavit that Dialed Number Recorders had provided agents with valuable information.  (See id. at 24-25.)  In

particular, Special Agent Breyer outlines the value of such information by stating that use on DNRs allows law enforcement officials to identify relationships between parties potentially involved in a conspiracy. (See id.) Special Agent Breyer explained that the use of DNRs would provide no further helpful information in the investigation because the fact that a relationship between the three individuals existed had already been established and the critical next step of the investigation was to discover the nature of that relationship. (See id.) Although further use of DNRs would potentially allow investigators to establish relationship between Mr. Gurrola and other individuals, without being privy to the content of communications with those individuals, Special Agent Breyer contended that the investigation would likely stall. (See id.) In support of this conclusion, Special Agent Breyer pointed out that use of DNRs alone had failed to establish that Mr. Gurrola was serving as a supplier for Ms. Uribe and Mr. Camerana. (See id.) It reasonably follows that agents would not have been able to establish who was serving as Mr. Gurrola's supplier without obtaining wiretaps of the phone lines Mr. Gurrola used.

      Finally, the affidavit submitted by Special Agent Breyer stressed the need for obtaining information as quickly as possible because the targets were already showing signs of suspicion. (See id. at 25-26.) In the affidavit, Special Agent Breyer states that Special Agent Crosby, the primary investigating agent on the case, had interviewed an individual in his capacity as a DEA officer who he later learned was associated with the targets of the wiretap investigation. (See id. at 25.) Additionally, investigators had intercepted conversations evidencing a growing distrust of a key confidential informant. (See Ex. 2 Aff. at 23.) According to Special Agent Breyer, the risk that the targets would connect Special Agent Crosby with law enforcement and realize that they were the subjects of a criminal investigation was increasing each day. (See id. at 25-26.)

Reviewing the application as a whole, the court is convinced that the United States satisfied its duty to show that the wiretap was necessary under the circumstances. Special Agent Breyer's affidavit appropriately details prior investigatory techniques and explains why continued use of those techniques was not likely to advance the investigation.

But Mr. Gurrola argues that even if the initial wiretap identifying him as a target was justified by necessity, the United States's subsequent wiretap applications were merely piggybacking upon the September 13, 2004 application without considering whether traditional investigatory techniques could once again be successfully employed. The Tenth Circuit has "held that the government may not move swiftly from wiretap to wiretap, [but] the government is not necessarily under an obligation to repeat these forms of investigation between each wiretap." Garcia, 232 F.3d at 1315 (internal quotation and citation omitted). Rather, the government is simply obligated to "consider whether normal investigative procedures could be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap." Id. (internal quotation omitted).

Here, the evidence obtained from the call monitoring allowed by approval of the September 13, 2004 application did nothing but reaffirm the necessity of intercepting the targets' calls. The court is convinced that no intervening event during the time frame in which the five later applications were submitted undercuts the validity of the necessity showing contained in the initial application. Each wiretap application details the steps agents had taken in pursuing the investigation and adequately explains why traditional investigation methods would either not be successful or would be too dangerous to pursue. The applications reveal that the targets were growing increasingly suspicious and that the potential danger to Special Agent Crosby was becoming a greater concern. The goal of the investigation remained the same, the difficulties

investigators faced remained the same, and the probability that traditional investigative techniques would succeed remained the same.  Under the circumstances, the court holds that each of the wiretap applications targeting Mr. Gurrola were supported by a sufficient showing of necessity.  See Wright, 156 F. Supp. 2d at 1229-30 ("Collecting necessary information about the highest level participants in the conspiracy remained the difficult goal of the investigation, and traditional investigative techniques simply had not worked and held little likelihood of providing the evidence needed for a criminal prosecution . . . . [T]he proceeding wiretaps did not obviate the need for extensions or additional wiretaps, nor were there changed circumstances or new events indicating that traditional investigative techniques should be tried again.").

## II.  Minimization

Mr. Gurrola contends that, even if the wiretaps were lawfully obtained, the United States failed to meet its obligation to minimize the surveillance in accordance with the authorizing order.  The United States Code requires investigating officials to take steps to minimize the amount of information intercepted under a wiretap by ceasing to monitor conversations when it is clear that no illegal activity is being discussed.  See 18 U.S.C. § 2518(5).  The United States Supreme Court has held that "[t]he statute does not forbid the interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations.  Whether the agents have in fact conducted the wire tap in such a manner will depend on the facts and circumstances of each case."  United States v. Scott, 436 U.S. 128, 140 (1978).

Mr. Gurrola identifies three phone calls that he claims evidence a governmental failure to comply with minimization requirements; specifically, calls 7, 9, and 10 of telephone number 910-2460.  A review of those calls reveals that the United States was not derelict in its duty to

minimize interception. Call number 7 contained only twenty-two seconds of conversation. The court agrees with the United States that it is reasonable for agents to listen to twenty-two seconds of conversation in an attempt to identify the nature of the call. Call number 9 contained only eleven seconds of conversation. Again, the court concludes that no minimization of such a short interception was required. Call number 10 lasted a total of one minute and fifty seconds. Agents monitored the call for approximately one minute before determining that the call was non-pertinent. After thirty seconds passed, the agents once again listened in to determine if the call had become pertinent. The agents listened in on the remainder of the call, which lasted approximately twenty seconds. The court agrees with the United States that its monitoring of call number 10 was objectively reasonable under the circumstances.

Conclusion and Order

The court concludes that each of the wiretap applications identifying Mr. Gurrola as a target adequately established the necessity of a wiretap. Further, the court concludes that the United States adequately met its obligation to minimize its surveillance. Therefore, the court DENIES Mr. Gurrola's motion to suppress.

SO ORDERED this 15th day of February, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge